

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:22-cr- 044 |
| v. | 18 U.S.C. § 1349<br>Conspiracy to Commit Mail Fraud<br>(Count One) |
| SADIE MITCHELL, | |
| *Defendant.* | 18 U.S.C. § 1343<br>Wire Fraud<br>(Count Two) |
| | Forfeiture Allegation |

**CRIMINAL INFORMATION**

THE UNITED STATES ATTORNEY CHARGES THAT:

**INTRODUCTORY ALLEGATIONS**

At all times relevant to this Information, unless otherwise stated:

1. The defendant, SADIE MITCHELL, resided in Richmond, Virginia, within the Eastern District of Virginia.

2. The defendant was an employee of the Virginia Department of Motor Vehicles from September 30, 2013, through April 24, 2019. The defendant was employed at the Virginia Motor Vehicle Dealer Board from April 25, 2019, through April 3, 2021.

3. Due to her employment with the Virginia Department of Motor Vehicles and the Virginia Motor Vehicle Dealer Board, the defendant had access to a government database that contained the personal identifying information of Virginia residents.

1

### *Small Business Administration*

4.      The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disaster.

### *Virginia Unemployment Insurance Program*

5.      Following the emergence of the novel coronavirus ("COVID-19"), the United States Government took steps to slow the spread of the virus and to mitigate its impact on the public's health and economic wellbeing.

6.      On March 13, 2020, President Donald J. Trump declared the ongoing COVID-19 pandemic to be an emergency under Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act").

7.      On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES ACT") was signed into law. The CARES Act created the Pandemic Unemployment Assistance ("PUA") program, which provided unemployment benefits to individuals not eligible for regular unemployment compensation or extended unemployment benefits.

8.      The CARES Act also provided for an emergency increase in unemployment compensation benefits, referred to as Federal Pandemic Unemployment Compensation ("FPUC").  FPUC provided eligible individuals with $600 per week in addition to the weekly benefit amount they received from certain other unemployment compensation programs, to include PUA.

9. As of April 18, 2020, the President declared that a major disaster existed in all States and territories under Section 401 of the Stafford Act. On August 8, 2020, to further offset the pandemic's impact on American workers, the President authorized the Federal Emergency Management Agency ("FEMA") to expend up to $44 billion from the Disaster Relief Fund for lost wage payments. The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance ("LWA") to those receiving unemployment insurance.

10. The PUA, FPUC, and LWA programs are administered by the various states, including the Commonwealth of Virginia, but the programs' benefits are funded in part by the federal government.

11. Unemployment insurance ("UI") is a joint state-federal program intended to provide temporary financial assistance to unemployed workers under certain circumstances. The federal unemployment trust fund provides support and funding for state UI programs. For instance, during periods of high unemployment, the federal government provides partial funding to states for payment of extended benefits to UI recipients. States can also borrow from the federal UI fund if their own funds are insufficient.

12. The Commonwealth of Virginia managed its unemployment insurance compensation program through the Virginia Employment Commission ("VEC"). Under normal circumstances, eligible Virginia UI recipients receive a minimum of $158 per week.

13. In the wake of the COVID-19 pandemic, the PUA and FPUC programs increased weekly benefits for Virginia UI recipients to a minimum of $758 per week.

14. To be eligible for Virginia UI benefits, claimants must have had their hours reduced by their employer or been separated from employment altogether. Once the VEC

approves a claim, the claimant must re-certify unemployment status on a weekly basis. Specifically, claimants must certify that they are ready, willing, and able to work each day during the weeks they are claiming UI benefits.

15. Successful applicants may choose whether to have the VEC deposit their unemployment benefits directly in a linked bank account or loaded onto a prepaid debit card (called "Way 2 Go" cards), which is shipped to the applicant via the United States Postal Service to the physical address listed on the application. For applicants who choose a debit card, a personal identification number for the card is sent to the address listed on the application in a separate mailing. Prepaid cards are automatically reloaded with newly disbursed funds via electronic transfers using the Internet.

### *The Paycheck Protection Program*

16. In addition to the PUA program, another source of relief provided by the CARES Act in response to the COVID-19 pandemic was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses through a program referred to as the Paycheck Protection Program ("PPP").

17. To obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business. The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant had to state, among other things, the business's: (a) average monthly payroll expenses; and (b) number of employees. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.

18. A PPP loan application had to be processed by a participating financial institution (the lender). If the PPP loan application was approved, the lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

19. PPP loan proceeds could only be used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The proceeds of a PPP loan were not permitted to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

20. While this first draw PPP program ended on May 31, 2021, certain borrowers were eligible to apply for second draw PPP loans. Eligible borrowers included businesses that: had no more than 300 employees; which had previously received a PPP loan and would or had already used the full amount only for authorized uses; and which could demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. Second draw PPP loans were approved with the same general loan terms as the first draw PPP loans.

### *Economic Injury Disaster Loan*

21. Another source of relief provided by the CARES Act was an expansion of an existing disaster-related program: the Economic Injury Disaster Loan ("EIDL"). This program provides loan assistance, including $10,000 advances, for small businesses and other eligible entities for loans up to $2 million. The EIDL proceeds can be used to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred; however, such loan proceeds are not intended to replace lost sales or profits or for expansion of a business.

22. Unlike certain other types of SBA-guaranteed loans, EIDL funds are issued directly from the United States Treasury and applicants apply through the SBA via an online portal and application. The EIDL application process, which also uses certain outside contractors for system support, collects information concerning the business and the business owner, including, but not limited to, the following: (a) information as to the gross revenues for the business prior to January 31, 2020; (b) the cost of goods sold; (c) the number of employees; and (d) information regarding the criminal history of the business owner. Applicants electronically certify that the information provided is accurate and are warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds may result in sanctions, including criminal penalties.

**Count One**
(Conspiracy to Commit Mail Fraud)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

23. From on or about May 19, 2020, and continuing through on or about August 9, 2021, in the Eastern District of Virginia, the defendant, SADIE MITCHELL, knowingly and intentionally combined, conspired, confederated, and agreed with Co-Conspirator 1 to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice and attempting to do so, causing any matter and thing to be sent and delivered by the United States Postal Service in violation of Title 18, United States Code, Section 1341.

24. The purpose of this conspiracy was for the defendant and Co-Conspirator 1 to unjustly enrich themselves by fraudulently obtaining money which they were not entitled to by filing false claims for PUA/UI benefits with the VEC.

### *The Ways, Manner, and Means of the Conspiracy*

The ways, manner, and means by which the conspirators sought to accomplish the conspiracy included, but were not limited to, the following:

25. It was part of the conspiracy that Co-Conspirator 1 would obtain the names, dates of birth, and social security numbers of inmates serving sentences at correctional centers for use in filing fraudulent PUA/UI claims. Once obtained, Co-Conspirator 1 would share this information with the defendant.

26. After receiving the inmates' personal identifying information, the defendant used this information to file fraudulent PUA/UI claims with the VEC online. These applications contained false information, including, but not limited to, the following:

   a. A false physical address rather than the correctional facility at which the inmates were actually confined;

   b. A false "last employer," as the inmates were incarcerated and not employed; and

   c. A false certification that the inmates were ready, willing, and able to work in the event employment became available.

27. It was further part of the conspiracy that, following the filing of the false and misleading PUA/UI claims, "Way 2 Go" debit cards were routinely mailed to addresses in the Eastern District of Virginia selected by the defendant. The defendant and Co-Conspirator 1 would share the Way 2 Go cards with each other, and they would use the funds contained on the cards for their own personal benefit. For some applications, however, instead of Way 2 Go cards, the defendant and Co-Conspirator 1 requested that the PUA/UI benefit payments be directly deposited into financial accounts the conspirators controlled.

28. On a weekly basis, the defendant and Co-Conspirator 1 would submit recertifications of unemployment status for these fraudulent claims, resulting in the disbursal of additional funds by the VEC.

29. In total, the defendant and Co-Conspirator 1 filed at least 20 knowingly false and misleading PUA/UI applications using the personal identifying information of inmates, resulting in the VEC disbursing over $300,000 in PUA/UI benefits as a result of those fraudulent claims.

30. It was further part of the conspiracy that the defendant and Co-Conspirator 1 filed fraudulent PUA/UI claims using the personal identifying information of other individuals. The vast majority of these individuals had no knowledge that their personal identifying information had been compromised and used by the conspirators to file fraudulent PUA/UI applications. On some occasions, however, the conspirators filed fraudulent PUA/UI applications using the personal identifying information of individuals who were aware of the fraudulent applications filed by the defendant on their behalf, and who shared in the fraudulently-obtained PUA/UI benefits generated by those applications.

31. For instance, Co-Conspirator 1 would generally provide the defendant with names of individuals—who were not inmates—for the defendant to query in a government database the defendant had access to through her employer, the Virginia Motor Vehicle Dealer Board. By querying this government database, the defendant would obtain the dates of birth and social security numbers of these individuals.

32. Subsequently, the defendant and Co-Conspirator 1 would electronically submit fraudulent PUA/UI applications to the VEC using the personal identifying information of these individuals. The defendant and Co-Conspirator 1 provided false and misleading information on

these applications, such as the physical addresses of the applicants and the applicants' purported last employer.

33. Once those PUA/UI applications were approved, the VEC would regularly mail Way 2 Go debit cards containing the corresponding PUA/UI benefits to addresses in the Eastern District of Virginia selected by the defendant and Co-Conspirator 1. The defendant and Co-Conspirator 1 would thereafter submit weekly recertifications of unemployment status for these fraudulent claims to the VEC, resulting in additional PUA/UI funds being loaded onto the debit cards. On some occasions, the defendant and Co-Conspirator 1 requested that the VEC directly deposit the benefit payments into financial accounts they controlled. The defendant and Co-Conspirator 1 used these fraudulently-obtained funds for their own personal benefit.

34. In total, the defendant and Co-Conspirator 1 filed at least 30 knowingly false and misleading PUA/UI applications in the names of other individuals, resulting in the VEC disbursing over $700,000 in PUA/UI benefits as a result of those fraudulent claims.

35. It was further part of the conspiracy for the defendant and Co-Conspirator 1 to file false and misleading PUA/UI applications for themselves. Specifically, on or about May 19, 2020, the defendant filed a PUA/UI application in her name and using her personal identifying information. On this application, the defendant falsely represented that her employment had been terminated on April 25, 2019, when, in fact, the defendant was employed and was working at the Virginia Motor Vehicle Dealer Board at the time she filed her application. The defendant concealed this information in order to deceive the VEC as to her eligibility for PUA/UI benefits, and to unjustly receive benefit payments.

36. On or about May 19, 2020, with the knowledge and consent of Co-Conspirator 1, the defendant filed a false and misleading PUA/UI application in the name of Co-Conspirator 1,

using Co-Conspirator 1's personal identifying information. On this application, the defendant made false statements and representations to deceive the VEC, such as providing a false last employer for Conspirator 1, a false address for Conspirator 1's purported last employer, and a false employment termination date.

37. Ultimately, the VEC approved the false and misleading applications the conspirators submitted in their own names. As a result of these fraudulent applications, the defendant and Co-Conspirator 1 received over $20,000 in PUA/UI funds.

### *Mailings in Furtherance of the Conspiracy*

38. In furtherance of this conspiracy, the defendant and Co-Conspirator 1 routinely caused to be placed in a post office and authorized depository for mail matter, to be delivered by the United States Postal Service to addresses in the Eastern District of Virginia, the following matter: Way 2 Go debit cards containing fraudulently-obtained PUA/UI benefits.

(In violation of Title 18, United States Code, Section 1349.)

### Count Two
(Wire Fraud)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

39. From on or about June 26, 2020, and continuing through on or about June 14, 2021, in the Eastern District of Virginia, SADIE MITCHELL, the defendant herein, knowingly devised and intended to devise a scheme and artifice to defraud and for obtaining money by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice, and the execution thereof, operated in substance as follows:

### *The Scheme and Artifice*

40.     The object of the defendant's scheme and artifice was to enrich herself and others by obtaining EIDL and PPP loan proceeds under false and misleading pretenses.

41.     It was part of the scheme and artifice for the defendant to submit false and misleading PPP loan applications to financial institutions.  In total, the defendant submitted three such PPP applications for businesses that she claimed to own and operate, and two more PPP applications for businesses the defendant claimed were owned and operated by other individuals.

42.     On each of these applications, the defendant made knowingly false statements and knowingly false certifications to mislead the financial institutions, including, but not limited to, the following misrepresentations:

    a.     Providing false and fabricated gross income figures for the businesses;

    b.     Falsely certifying that the businesses were in operation on February 15, 2020; and

    c.     Falsely certifying that the loan proceeds would be used exclusively for eligible business expenses.

43.     All five of the PPP loan applications submitted by the defendant were approved and funded, resulting in the disbursal of $97,462 in proceeds by the financial institutions.

44.     It was further part of the scheme and artifice for the defendant to submit false and misleading EIDL applications to the SBA.  In total, the defendant submitted six EIDL applications for businesses she claimed to own and operate, and another two applications for businesses purportedly owned and operated by Co-Conspirator 1.  None of these businesses, in truth and fact, and as the defendant well knew, had any customers, employees, or business activity.

45. Although the specific misrepresentations the defendant employed varied from application to application, the defendant's false statements and misrepresentations on these EIDL applications included, but were not limited to, the following:

    a. Providing false gross revenue and costs of goods sold figures for the businesses;

    b. Inflating or fabricating the employee count of the businesses; and

    c. Falsely certifying that the information in the applications was true and accurate.

46. Ultimately, none of the defendant's fraudulent EIDL applications were approved by the SBA, but in response to one of the false and misleading applications the defendant submitted, the SBA disbursed a $10,000 advance to a bank account designated by the defendant. Ultimately, these funds were not spent on eligible expenses under the EIDL program.

### *Execution of the Scheme and Artifice to Defraud*

47. For the purpose of executing the aforesaid scheme and artifice to defraud, the defendant routinely caused wire transmissions in interstate commerce, including wire transmissions of PPP loan proceeds from financial institutions located outside of the Commonwealth of Virginia to bank accounts controlled by the defendant and located within the Eastern District of Virginia.

48. For example, on or about April 26, 2021, for the purpose of executing and attempting to execute the scheme and artifice described above, the defendant caused to be transmitted by means of wire communication in interstate commerce the signs, signals, and writings described herein: following the approval of one of the fraudulent PPP loan applications described above, a financial institution initiated a wire transmission of $20,833, constituting fraudulently-obtained PPP loan proceeds, from the financial institution's bank account in Pasadena, California, to the defendant's bank account in the Eastern District of Virginia.

(In violation of Title 18, United States Code, Section 1343.)

## FORFEITURE ALLEGATION

49. Pursuant to Rule 32.2(a) Fed. R. Crim. P., defendant, SADIE MITCHELL, is hereby notified that upon conviction of the offense alleged in Count One of this Criminal Information, she shall forfeit to the United States any property, real or personal, which constitutes, or is derived from, proceeds traceable to such violation.

The defendant is further advised that if convicted of the offense alleged in Count Two of this Criminal Information, she shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such violation.

The property subject to forfeiture includes, but is not limited to, the following:

A sum of money of at least $1,023,325.24, which represents the proceeds of the offenses charged and which shall be reduced to a money judgment against the defendant in favor of the United States; however, such judgment shall be partially offset by the forfeiture of the following:

- Navy Federal Credit Union (NFCU) cashier's check no. 0452956392 in the amount of $34,853.27, turned over by the defendant to the United States Postal Inspection Service (USPIS) on October 27, 2021;

- NFCU cashier's check no. 0452957999 in the amount of $368.97, turned over by the defendant to USPIS on October 27, 2021; and

- NFCU cashier's check no. 0453651672 in the amount of $27,240.70, turned over by the defendant to USPIS on February 14, 2022.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets, pursuant to 21 U.S.C. § 853(p).

(All in accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461, Title 18, United States Code, Section 982(a)(2), and Title 21, United States Code, Section 853(p).)

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: April 19, 2022

By: */s/*
Kashan K. Pathan
Assistant United States Attorney

By: */s/*
Carla Jordan-Detamore
Assistant United States Attorney